RAMON O. LAGUER,

                           Plaintiff,

      - versus -

CAROLYN W. COLVIN,
Acting Commissioner of Social Security,

                          Defendant.

MEMORANDUM
AND ORDER
15-CV-0230 (JG)

A P P E A R A N C E S:

    RAMON O. LAGUER
        24 Humboldt Street, Apt 11H
        Brooklyn, New York 11206
    By:   *Plaintiff Pro Se*

    KELLY T. CURRIE
        United States Attorney
        Eastern District of New York
        271 Cadman Plaza East
        Brooklyn, New York 11201
    By:   Kathleen A. Mahoney, Assistant U.S. Attorney
        *Attorney for Defendant*

JOHN GLEESON, United States District Judge:

        Ramon O. Laguer brings this action against the Acting Commissioner of Social Security ("Commissioner") pursuant to 42 U.S.C. § 405(g). Laguer seeks review of the Commissioner's final decision dated September 16, 2013, which found that he was not disabled and therefore not entitled to disability insurance benefits or Supplemental Security Income ("SSI") as provided for in Titles II and XVI of the Social Security Act ("the Act"). Both parties moved for judgment on the pleadings, with the Commissioner seeking an affirmation and dismissal and Laguer seeking a grant of benefits or a remand for a new hearing and consideration

of newly submitted evidence. For the reasons that follow, the Commissioner's motion is granted and Laguer's motion is denied.

BACKGROUND

Laguer was born on January 28, 1974. R. 97-98, 208.[1] He has an associate's degree in computer technology. *Id.* at 98-99, 235. From 1997 to June 2000, Laguer worked as a sales associate at office supply and computer stores, including Staples and Office Depot. *Id.* at 69, 235. From June 2000 to February 2005 he worked as a computer technician. *Id.* at 69-70, 101, 235. Laguer subsequently worked as a school bus driver and as a security officer for various employers. *Id.* at 251, 254. On August 29, 2009, he stopped working after spraining his ankle. *Id.* at 76, 234. He later discovered he has a heart condition. *Id.* at 77-78, 234.

Laguer lives in an apartment with his mother and father. *Id.* at 240. His daily activities include watching television, using his computer, walking to the library, and reading. *Id.* at 244-245. He also reports that he is able to attend to self-care tasks, cook, sweep, dust, do laundry, shop, and negotiate public transportation although at a slow rate. *Id.* at 78, 85-88, 247, 265, 509. He experiences fatigue and sometimes falls asleep. *Id.* at 78, 85-88, 247, 265, 509. Laguer also describes hearing a cracking sound in his chest while showering and pain while dressing. *Id.* at 85-86. Additionally, Laguer reports that he plays light racquetball alone, once per week, and that he sometimes experiences chest pain afterwards. *Id.* at 89-90.

A. *Procedural History*

Laguer filed an application for SSI on December 13, 2011, alleging a disability onset date of August 29, 2009. *Id.* at 208-15. He claimed to suffer from congenital heart disease, heart valve disease, atrial septal defect, and ventricular septal defect for which he was to undergo surgery. *Id.* at 34, 304-06.

---

[1] Citations in the form "R.__" are to the pages of the administrative record.

The Commissioner denied the claim on April 26, 2012, and Laguer requested a hearing. *Id.* at 30. A hearing was held before an ALJ on March 21, 2013, but, after some brief testimony from Laguer, it was adjourned to allow Laguer to retain an attorney. *Id.* at 53-54. The hearing resumed on July 23, 2013, and Laguer remained unrepresented by counsel. *Id.* at 58. The ALJ issued a decision on September 16, 2013, in which she concluded that Laguer is not disabled. *Id.* at 27-43. Laguer submitted a request to the Appeals Council for review of the ALJ's decision. *Id.* at 1. The request was denied on November 19, 2014, rendering the ALJ's adverse finding the Commissioner's final decision. *Id.* at 1-4. Laguer filed this action on January 14, 2015, alleging that he is disabled under the regulations because of his heart condition.

B.  *The Medical Evidence*

Laguer's main medical issue stems from his congenital heart disease, which was diagnosed in 2006. At that time, he had a physical examination at Woodhull Medical and Mental Health Center ("Woodhull"), as part of his effort to become a policeman. *Id.* at 76-77. Doctors discovered his heart problem, which rendered him ineligible for duty. *Id.* In 2007, Dr. Eduard Levy from Woodhull examined Laguer at least three times, and reported that Laguer had diastolic dysfunction (indicating that his heart is not filling with blood properly) and calcaneal spur (*i.e.*, a calcium deposit causing a bony protrusion on the heel of the foot). *Id.* at 317, 451, 484. The record is silent as to any medical problems or treatment for the next three years.

After the alleged onset date, in February 2010, Laguer returned to Woodhull, where he was examined by Dr. Ljubomir Vujovic for a variety of non-threatening afflictions including indigestion and constipation. *Id.* at 486-87. On August 10, 2011, during another routine visit with Vujovic, Laguer reported chest discomfort and shortness of breath with

exertion, and Vujovic referred him for an EKG and cardiac examination. *Id.* at 287. In September 2011, Laguer told a cardiologist at Woodhull, Dr. Victor Navarro, that he had experienced chest pain with exertion after jogging and riding his bike four months earlier (May 2011). *Id.* at 330-31, Ex. 2F. Laguer had discontinued exercise at that time and had not experienced chest pain since. *Id.* A physical examination yielded results within the normal limits. *Id.*

Laguer saw Dr. Ankita Shrivastava at the Woodhull cardiac clinic in October 2011 for a physical evaluation due to chronic fatigue. *Id.* at 297. He denied having chest pain and was not taking any heart medication. *Id.* Shrivastava ordered an EKG, a stress test, and an echocardiogram. *Id.* at 298. At a follow-up examination, Dr. Benedict K. Gaisie noted Laguer's heart murmur since birth and a grade 3/6 systolic murmur. *Id.* at 300-01. He referred Laguer to NYU Langone Medical Center ("NYU"). *Id.* at 301. Gaisie saw Laguer again on November 14, 2011 and noted no current active issues. *Id.* at 303. Two days later, Laguer saw Dr. Mohsen Ebneshahidi at the cardiac clinic, who noted an abnormal echocardiogram and good exercise tolerance. *Id.* at 304-05. Ebneshahidi classified Laguer as Class IIa, meaning that he had a slight physical limitation but was comfortable at rest and during the performance of ordinary duties, and recommended valve repair surgery if possible. *Id.* at 305.

Laguer underwent open heart surgery on January 18, 2012 to repair his mitral valve and to close a hole in the wall between his left and right atriums (*i.e.* an atrial septal closure). *Id.* at 330-31. Dr. Ralph Mosca performed the surgery. *Id.* at 331, 364-65. Laguer was discharged on January 24, 2012 but returned to the Woodhull emergency room on January 27, 2012 complaining of chest pain radiating to his left arm. *Id.* at 330, and 387-397, Ex. 17F. He was discharged the next day after it was determined he had not had a heart attack. *Id.* at 390.

4

Laguer's post-surgery record indicates that he was able to bounce back from his surgery relatively quickly. In February 2012, Dr. Mosca reported to Dr. Navarro that Laguer was recovering well from the surgery, and had no other problem other than the episode of chest pain, which had proven to be musculoskeletal in nature. *Id.* at 439, Ex. 17F. Mosca said that he had told Laguer that he should gradually increase his physical activity and begin to resume his normal daily activities. *Id.* Later that month, Laguer followed up with Navarro and reported no chest pains, palpitations, or dizziness. *Id.* at 503, Ex. 7F. On April 4, 2012, during another follow-up visit with physical assistant Magdalena Ratinella, Laguer again reported no chest pains, palpitations, or dizziness, and stated that he could walk more than five blocks or climb more than five flights of stairs. *Id.* at 562, Ex. 16F.

In May 2012, Laguer saw Dr. Samia Rizkalla at the medical clinic for complaints of occasional heart palpitations. *Id.* at 566-67. Rizkalla recommended that he stop drinking caffeinated drinks and to take his heart medication regularly. *Id.* at 567.

In July 2012, Laguer complained of palpitations but denied chest pains or shortness of breath to Dr. Anasari. *Id.* at 570-71. Echocardiograms from August and October 2012 revealed mild to moderate regurgitations (*i.e.*, leaking) and enlargements. *Id.* at 531-32, Ex. 15F; *see also* R. 579, Ex. 16F. A follow-up cardiac MRI in January 2013 produced results within and slightly below the normal limits. *Id.* at 607, Ex. 18F.

A stress test and EKG from March 2013 were within the normal limits. *Id.* at 619-620, Ex. 20F. However, Laguer continued to report palpitations and associated shortness of breath, which he stated occurred while lying down in bed, standing up from bending over, and lifting weights. *Id.* In a "Statement of Treatment" dated July 15, 2013, Dr. Vujovic wrote that Laguer was unable to work as a security guard, but may perform sedentary work. *Id.* at 622. In

July 2013, Dr. Navarro reviewed an EKG from Woodhull and concluded that it showed mild regurgitation. *Id.* at 618. Twenty-four hour EKG monitoring (*i.e.*, Holter monitoring), which records only rare events in the heart's functioning, was normal. *Id.* Navarro advised Laguer to avoid only strenuous jobs. *Id.* at 619.

       1.    *The Consultative Examination*

In April 2012, internal medical consultant, Dr. Shannon Gearhart, examined Laguer. *Id.* at 508-11, Ex. 8F. Laguer complained of shortness of breath, chest pain, palpitations, and upper back as well as bilateral knee pain since 2011. *Id.* at 508. Contrary to his declarations to P.A. Ratinella two weeks earlier, Laguer reported difficulty walking more than four blocks and experiencing fatigue when climbing four flights of stairs. *See id.* Gearhart observed that Laguer appeared to be in no acute distress and opined that Laguer was restricted from activities involving mild to moderate exertion and that he had mild restrictions from standing, walking, squatting and kneeling. *Id.* at 511.

On June 7, 2012, the state agency medical consultant, Dr. Burge, opined that Laguer was able to perform light work. *Id.* at 525, Ex. 12F; *see also id.* at 512-17, 523, Exs. 9F, 11F-13F. Laguer was found to be able to lift/carry up to twenty pounds occasionally and up to ten pounds frequently. *Id.* at 513, Ex. 9F. The assessment also noted that Laguer can stand/walk and sit six out of eight hours of the day. *Id.* The assessment included environmental restrictions to avoid even moderate exposure to fumes, odors, dusts, gases, and poor ventilation. *Id.* at 515, Ex. 9F. He cannot work at jobs requiring the operation of heavy machinery, or exposure to workplace hazards such as unprotected heights, unprotected machinery, and machinery with moving mechanical parts. *Id.*

2. *The Vocational Expert's Testimony*

At the hearing, a vocational expert testified that Laguer is unable to perform his past relevant work (*i.e.*, skilled light work), as the exertional demands exceed his RFC. *Id.* at 104. However, based on a hypothetical individual of Laguer's age, education, work experience, and RFC, the expert testified that such an individual would be capable of making a successful adjustment to other sedentary jobs that exist in significant numbers in the national economy. *Id.* at 38-39, 105-07.

3. *New Evidence Submitted to the Appeals Council*

Laguer submitted a request for review to the Appeals Council with new evidence, which included: (1) an exercise stress test from June 11, 2014, which indicated a medium to large amount of fixed defect in the apex and a small amount of fixed defect in the inferior wall, *id.* at 19-20; (2) an MRI of Laguer's knee that revealed a "grade 1" sprain, moderate degenerative changes, and small to moderate joint effusion (*i.e.* swelling), and an inability to walk upstairs from July 25, 2014, *id.* at 18; (3) a copy of an application for discharge of student loans based on permanent and total disability dated August 18, 2014, in which his treating physician, Dr. Vujovic stated that Laguer had congenital heart disease status post repair and was unable to work, *id.* at 221-22; and (4) an EKG from September 15, 2014, which showed a slow heart rate, *id.* at 17.

DISCUSSION

A. *The Legal Standards*

1. *The Commissioner's Five-Step Analysis*

A claimant seeking disability insurance benefits must establish that, "by reason of any medically determinable physical . . . impairment which . . . has lasted or can be expected to

last for a continuous period of not less than twelve months," 42 U.S.C. § 1382c(a)(3)(A), "he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy[.]" *Id.* § 1382c(a)(3)(B).

The Social Security regulations direct a five-step analysis for the Commissioner to evaluate disability claims:

> First, the [Commissioner] considers whether the claimant is currently engaged in substantial gainful activity. If he is not, the [Commissioner] next considers whether the claimant has a "severe impairment" which significantly limits his physical or mental ability to do basic work activities. If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which is listed in Appendix 1 of the regulations. If the claimant has such an impairment, the [Commissioner] will consider his disabled without considering vocational factors such as age, education, and work experience; the [Commissioner] presumes that a claimant who is afflicted with a "listed" impairment is unable to perform substantial gainful activity. Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity to perform past work. Finally, if the claimant is unable to perform his past work, the [Commissioner] then determines whether there is other work which the claimant could perform.

*DeChirico v. Callahan*, 134 F.3d 1177, 1179-80 (2d Cir. 1998) (alterations in original) (quoting *Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir.1982)); *see also* 20 C.F.R. § 404.1520(a)(4)(i)-(v) (setting forth this process). The claimant bears the burden of proof in the first four steps, the Commissioner in the last (but only to show that jobs exist in the national or local economies that the claimant can perform given her RFC and vocational factors). *See Green-Younger v. Barnhart*, 335 F.3d 99, 106 (2d Cir. 2003).

8

2. *Section 405(g)*

Under 42 U.S.C. § 405(g), Laguer has the right to district court review of "any final decision of the Commissioner of Social Security made after a hearing to which [s]he was a party, irrespective of the amount in controversy," and the court "shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." The court can also choose to "remand the case to the Commissioner of Social Security[,]" or, in appropriate cases, to "order additional evidence to be taken before the Commissioner of Social Security." *Id.*

In reviewing the Commissioner's decision, I must decide if it is supported by substantial evidence and if the correct legal standards were applied. *Johnson v. Bowen*, 817 F.2d 983, 985 (2d Cir. 1987). To decide this, I examine whether "the claimant has had a full hearing under the [Commissioner's] regulations and in accordance with the beneficent purposes of the Act." *Echevarria v. Sec'y of Health & Human Servs.*, 685 F.2d 751, 755 (2d Cir. 1982) (quotation marks and citation omitted). I then decide if the Commissioner's decision is supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Halloran v. Barnhart*, 362 F.3d 28, 31 (2d Cir. 2004) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)).

B. *The ALJ's Rejection of Laguer's Disability Claim*

The ALJ followed the five-step procedure outlined above for determining whether Laguer was disabled within the meaning of the Act. At the first step, the ALJ found that Laguer had not engaged in substantial gainful activity since his alleged onset date of August 29, 2009.

R. 32. At step two, the ALJ found that Laguer's status post repair of a septal defect in January 2012 and congenital mitral insufficiency constituted a "severe" impairment, which "causes more than minimal limitations in [Laguer's] ability to perform basic work activities." *Id*. At step three, the ALJ found that these impairments did not meet or medically equal the severity of one of the listed impairments in 20 C.F.R. § 404 Subpart P, Appendix 1 because "[t]he medical evidence of the record does not document signs, symptoms, and/or laboratory findings indicating any impairment or combination of impairments severe enough to meet the criteria of any listed impairment" and "no treating or examining physician has indicated findings that would satisfy the requirements of any listed impairment." R. 32-33.

The ALJ then found that Laguer had the RFC to perform sedentary work as defined in 20 C.F.R. §§ 404.1567(a) and 416.967(a) with the exceptions that he cannot climb ladders, ropes, or scaffolds; he cannot work at jobs containing even moderate exposure to airborne irritants such as fumes, odors, dusts, gases, and/or smoke; he cannot operate heavy machinery; and he cannot be exposed to moderate workplace hazards such as unprotected heights, unprotected machinery, and/or machinery with moving parts. R. 33. In making the RFC assessment, the ALJ relied on Laguer's medical symptoms, the medical evidence, and the opinion evidence. *Id.* at 36. Drs. Mosca and Navarro's medical opinions were accorded "great weight." *Id*. Drs. Gearhart and Burge's medical opinions were accorded "significant weight." *Id.* Based on that assessment, the ALJ found at step four that Laguer was unable to perform any of his past relevant work. *Id.* at 37. At step five, the ALJ found that Laguer was not disabled. Based on Laguer's RFC, vocational profile and the vocational expert's testimony, the ALJ concluded that Laguer would be capable of making a successful adjustment to other work that exists in significant numbers in the national economy. *Id.* at 38-39.

C.   *Analysis*

   1.   *Evaluation of the Medical Evidence*

Substantial evidence supports the Commissioner's finding that Laguer is not disabled within the meaning of the Act. The objective medical evidence and reported symptoms were insufficient to establish a disability. *See* 20 C.F.R. §§ 404.1529(c)-(d), 416.929(c)-(d). The physical evaluation that revealed Laguer's heart condition was conducted in 2006 in connection with his application to be a policeman. However, Laguer did not report any symptoms suggesting he was disabled until two years after his alleged onset date of August 2009. R. 287, 312, 315. Specifically, in August 2011 he told Dr. Vujovic that he had chest discomfort and shortness of breath on exertion. *Id.* at 287. The record also reflects that Laguer had seen his doctors on at least three occasions in the months before reporting the chest discomfort to Vujovic, and during those visits he complained mainly of constipation and gastritis. *Id.* at 284-86. Vujovic referred Laguer to the cardiac clinic, where Laguer reported tiredness and heart palpitations. *Id.* at 297. His diagnostic testing revealed severe mitral regurgitation and he was referred to NYU for surgery. *Id.* at 300-01.

Laguer underwent open heart surgery to repair the mitral valve and close a hole in the atrial-septum, which indisputably was a serious procedure. *See id.* at 331, 364-65. However, the record indicates that he recovered very well from the surgery. His surgeon, Dr. Mosco, reported that Laguer was doing "quite well" two-and-one-half weeks after the surgery, that he had no cardiovascular symptoms, and that he should gradually increase his physical activity and resume normal daily activities. *Id.* at 439. In February 2012, Dr. Agnieszka Buniowska at the Woodhull cardiac clinic noted that Laguer was recovering well. *Id.* at 423. Two months later, at

11

a medical evaluation at Woodhull in April 2012, Laguer reported being able to walk five blocks and climb five flights of stairs. *Id.* at 562. While he raised concerns regarding his ability to go back to work "due to his condition" and because he was having palpitations, he denied having chest pain on exertion. *Id.* at 562.

Subsequent medical examinations included in the record indicate that Laguer had full muscle strength, full ranges of motion, and normal muscle tone, further supporting the determination that he is able to perform sedentary work. *See id.* at 292, 510.

Importantly, Laguer's treating physician did not find him disabled. Specifically, Dr. Navarro, Laguer's treating cardiologist, concluded that "only strenuous jobs should be avoided." *Id.* at 619. This would include Laguer's prior job as a security guard. Dr. Vujovic also concluded that Laguer could perform sedentary work, although not as a security guard, in July 2013. *Id.* at 622. Thus, Vujovic's assessment further supports Navarro's opinion that Laguer should avoid only strenuous work.

The ALJ properly evaluated the medical source opinions, especially that of Laguer's treating physician, Dr. Navarro. Under the treating physician rule, the opinion of a treating physician is entitled to "controlling weight" if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and not inconsistent with other substantial evidence in the record. 20 C.F.R. §§ 404.1527(c), 416.927(c); *see, e.g.*, *Halloran*, 362 F.3d at 31-32. Here, the ALJ properly accorded Navarro's opinion great weight because of his longstanding treatment relationship with Laguer and because Navarro's opinion was supported by and consistent with the medical evidence in the record. *Id.* at 36. This would include Dr. Vujovic's assessment that Laguer could perform sedentary work, as well as the

various medical examination reports in the record indicating only mild physical restrictions.[2] *See* R. 622.

The ALJ also accorded significant weight to the opinion of the internal medical consultant, Dr. Gearhart. While an ALJ cannot rely on the RFCs of consulting examiners as evidence contradicting the treating physician's RFC, *see, e.g.*, *Box v. Colvin*, 3 F. Supp. 3d 27, 42 (E.D.N.Y. 2014), Gearhart's opinion actually supported the treating physician's RFC, and thus was accorded the appropriate weight. *See* R. 511, Ex. 8F ("[T]he claimant is restricted from activities requiring mild or greater exertion, given his cardiac condition. He also has a mild restriction from standing, walking, squatting, and kneeling."). These assessments were further corroborated by the opinion of another medical consultant who reviewed the case and affirmed the RFC determination in Exhibit 9F by a single decision maker ("SDM").[3] *Id.* at 525, Ex. 12F. Accordingly, the ALJ accorded this opinion significant weight as well.

Finally, an ALJ must assess a claimant's credibility when there is conflicting evidence in the record regarding the extent of the claimant's pain. *Snell v. Apfel*, 177 F.3d 128, 135 (2d Cir. 1999). Specifically, the Commissioner must evaluate the claimant's statements about the intensity and persistence of his symptoms and limitations to determine if they suggest a greater restriction of function than is demonstrated by the objective medical evidence. 20 C.F.R. §§ 404.1529(c), 416.929(c). The weight assigned to the claimant's testimony regarding the pain is within the ALJ's discretion. *Marcus v. Califano*, 615 F.2d 23, 27 (2d Cir. 1979). The

---

[2] The ALJ's decision does not state what weight, if any, he accorded Dr. Vujovic's opinion. However, even if he were to be considered a treating physician whose opinion also should have been accorded controlling weight, the outcome here would be the same because his assessment was that Laguer could perform sedentary work.

[3] An SDM is a non-medical professional who makes a disability determination and may also determine whether the other conditions for entitlement to benefits based on disability are met. 20 C.F.R. § 404.906(b)(2). An SDM's RFC assessments are not entitled to any medical weight as a medical opinion. *See Box*, 3 F. Supp. at 46 (quotation marks and citation omitted). The ALJ here did not accord the SDM's opinion any weight and instead used it to corroborate the other medical opinions in the record. *See* R. 36.

Commissioner considers evidence regarding these factors: the claimant's daily activities; the nature, location, onset, duration, frequency, and intensity of the symptoms; factors precipitating or aggravating the symptoms; the type, dosage, effectiveness, and side effects of medication; any other treatment; and any other measures utilized to relieve the symptoms. *See* 20 C.F.R. §§ 404.1529(c)(3)(i)-(vii); 416.929(c)(3) (i)-(vii).

The record shows that Laguer's claims about his symptoms have been inconsistent. For example, one month after his surgery, Laguer told Dr. Navarro that he had no chest pain, palpitations, or dizziness, R. 481, but two months later, in April 2012, he claimed to have heart palpitations at night, *id.* at 562. Notably, he also denied chest pains at this time, and reported that he was able to walk five blocks and climb five flights of stairs. *Id.* However, only two weeks later, he contradicted himself when he told the consultative examiner that he had trouble walking more than four blocks or climbing over four flights of stairs. *Id.* at 508. He also described having chest pains and palpitations, which he'd expressly denied to Navarro. *See id.* In fact, Laguer did not complain of palpitations at nighttime until April 2012, more than three months after his surgery, and after having seen multiple doctors in the interim. *Id.* at 562. Furthermore, Laguer's symptoms also seemingly worsened when he saw the consultative examiner, Dr. Gearhart. He reported shortness of breath and chest pain, symptoms he had denied on several occasions to his doctors and treating physician. *See id.* at 423, 475, 481, 508, 570, 618.

The ALJ also considered Laguer's daily activities in making her credibility assessment, which also counseled in favor of a finding that he was not disabled. Specifically, Laguer reported being able to cook, clean, do laundry, and go shopping. *Id.* at 81, 84, 87, 241-42, 509. He reported using public transportation, walking to the library on a nearly daily basis,

using the internet, reading, and watching movies. *Id.* at 81-90. Finally, Laguer reported stretching on a daily basis and playing light racquetball once per week. *Id.* at 82, 89-90.

The ALJ was not required to accept Laguer's statements about the disabling effects of his symptoms without question, and properly used her discretion to evaluate the credibility of his statements. *See Genier v. Astrue*, 606 F.3d 46, 49 (2d. Cir 2010). Coupled with the medical evidence in the record, Laguer's testimony supported a finding that he could perform sedentary work, and the ALJ did not err in coming to this conclusion.

2. *The Capability to Perform Sedentary Jobs That Exist in Significant Numbers*

At the fifth step of the sequential evaluation, the ALJ met his burden of showing that there is other work that Laguer could perform. *See Poupore v. Astrue*, 566 F.3d 303, 306 (2d Cir. 2009). The ALJ consulted the vocational expert and correctly concluded that Laguer could not perform his past relevant work as a sales associate or security guard, because it is light exertional work that exceeds his RFC. R. 37. The vocational expert then testified that there is other work in the national economy that someone with Laguer's exertional limitations and vocational factors (*i.e.*, age, education, and work experience) could perform. *Id.* at 102-09; *see also* §§ 20 C.F.R. 404.1520(g), 416.920(g); 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B). The ALJ posed a hypothetical to the vocational expert that included the nonexertional limitations that matched the RFC for sedentary work, and the expert testified that there were three examples of sedentary jobs that such an individual could perform, which exist in significant numbers in the national economy (specifically, addresser, order clerk, and ticket counter). R. 104-07. Accordingly, the ALJ satisfied the burden of showing that other work Laguer could perform exists. *See Poupore*, 566 F.3d at 306.[4]

---

[4] Laguer did not seem to understand the difference between the capability to do his past relevant work and doing any work at all. When discussing his inability to be a security guard or in law enforcement,

CONCLUSION

Because the Commissioner's determination was supported by substantial evidence and the proper legal standards were applied in determining that Laguer is not disabled within the meaning of the Act, the Commissioner's motion for judgment on the pleadings is granted. And because the matter is not being remanded for a new hearing, I need not address the whether the new evidence should be considered.

So ordered.

John Gleeson, U.S.D.J.

Dated: October 6, 2015
       Brooklyn, New York

---

Laguer stated that he's "not interested in any other field" and implied that trying to do other work would be futile because he was "going to fail in it." R. 92. He then expressed his concerns with not being able to secure employment because the "job market is very hard" and there is "a lot of competition." *Id.* at 93. Laguer's frustration was clear when he said that it was a "problem" that the vocational expert would not help him find a job, and that he was "screwed" because of it. *Id.* at 95. While it might be true that the job market can be competitive and jobs difficult to find, this has no bearing on Laguer's disability status and his ability to do sedentary work.